**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Thomas L. Long
Mark A. Kornfeld
Michelle R. Kaplan
Torello H. Calvani

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (BRL) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. _____ (BRL) |
| Plaintiff, | |
| v. | **COMPLAINT** |
| BANK HAPOALIM B.M. and BANK HAPOALIM (SWITZERLAND) LTD., | |
| Defendants. | |

Irving H. Picard (the "Trustee"), as trustee for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS"), and the substantively consolidated estate of Bernard L. Madoff, individually, under the Securities Investor Protection Act ("SIPA"), 15 U.S.C. §§ 78aaa *et seq.*, for this Complaint against Bank Hapoalim B.M. ("Hapoalim B.M.") and Bank Hapoalim (Switzerland) Ltd. ("Hapoalim Switzerland") (together, the "Hapoalim Defendants"), alleges the following:

I.  **NATURE OF THE ACTION**

1. This adversary proceeding is part of the Trustee's continuing efforts to recover BLMIS Customer Property[1] that was stolen as part of the massive Ponzi scheme perpetrated by Bernard L. Madoff ("Madoff") and others.

2. With this Complaint, the Trustee seeks to recover approximately $27,637,884 in subsequent transfers of Customer Property made to the Hapoalim Defendants. The subsequent transfers were derived from investments with BLMIS made by Fairfield Sentry Limited ("Fairfield Sentry") and Kingate Global Fund Ltd. ("Kingate Global"), which were Madoff feeder funds (collectively, the "Feeder Funds"). The Feeder Funds are British Virgin Islands ("BVI") companies that are in liquidation in the BVI. The Feeder Funds had direct customer accounts with BLMIS's investment advisory business ("IA Business") for the purpose of investing assets with BLMIS. Each of the Feeder Funds maintained in excess of 95% of its assets in its BLMIS customer accounts.

3. When the Hapoalim Defendants received the subsequent transfers of BLMIS Customer Property, Hapoalim B.M. was a global private bank with branches, subsidiaries, and

---

[1] SIPA § 78*lll*(4) defines "Customer Property" as cash and securities at any time received, acquired, or held by, or for the account of, a debtor from, or for, the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted.

representative offices in North and Latin America, Europe, the Far East, and Australia where it engaged in trade, corporate finance, private banking and retail banking.

## II. JURISDICTION AND VENUE

4. The Trustee brings this adversary proceeding pursuant to his statutory authority under SIPA §§ 78fff(b), 78fff-1(a), and 78fff-2(c)(3); sections 105(a), 550(a), and 551 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et. seq.* (the "Bankruptcy Code"); and the New York Fraudulent Conveyance Act (New York Debtor & Creditor Law) ("NYDCL") §§ 273-279 (McKinney 2001), to obtain avoidable and recoverable transfers received by the Hapoalim Defendants as subsequent transferees of funds originating from BLMIS.

5. This is an adversary proceeding brought in this Court, in which the main underlying substantively consolidated SIPA case, Adv. Pro. No. 08-01789 (BRL) (the "SIPA Case"), is pending. The SIPA Case was originally brought in the United States District Court for the Southern District of New York (the "District Court") as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC, et al.*, No. 08 CV 10791 (the "District Court Proceeding"). This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and 15 U.S.C. § 78eee(b)(2)(A), (b)(4).

6. The Hapoalim Defendants are subject to personal jurisdiction in this judicial district because they purposely availed themselves of the laws and protections of the United States and the state of New York by, among other things, knowingly directing funds to be invested with New York-based BLMIS through the Feeder Funds. The Hapoalim Defendants knowingly received subsequent transfers from BLMIS by withdrawing money from the Feeder Funds.

7. By directing their investments through Fairfield Sentry, a Fairfield Greenwich Group ("FGG") managed feeder fund, Hapoalim Switzerland knowingly accepted the rights,

2

benefits, and privileges of conducting business and/or transactions in the United States and New York. Upon information and belief, Hapoalim Switzerland entered into a subscription agreement with Fairfield Sentry under which it submitted to New York jurisdiction, sent a copy of the subscription agreement to FGG's New York City office, and wired funds to Fairfield Sentry through a bank in New York. Further, upon information and belief, Hapoalim Switzerland maintained a bank account at JP Morgan Chase Bank in New York which it used to receive redemption proceeds from Fairfield Sentry. Hapoalim Switzerland thus derived significant revenue from New York and maintained minimum contacts and/or general business contacts with the United States and New York in connection with the claims alleged herein.

8. Hapoalim Switzerland should reasonably expect to be subject to New York jurisdiction, and is subject to personal jurisdiction pursuant to New York Civil Practice Law & Rules ("NY CPLR") § 302 (McKinney 2001) and Bankruptcy Rule 7004.

9. Hapoalim B.M. maintains a business address in New York and is thus subject to New York jurisdiction pursuant to NY CPLR § 301 and Bankruptcy Rule § 7004.

10. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (F), (H), and (O).

11. Venue in this District is proper under 28 U.S.C. § 1409.

### III.  BACKGROUND

12. On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for violation of the criminal securities laws, including, *inter alia*, securities fraud, investment adviser fraud, and mail and wire fraud. Contemporaneously, the U.S. Securities and Exchange Commission ("SEC") commenced the District Court Proceeding against Madoff and BLMIS. The SEC complaint alleges that Madoff and BLMIS engaged in fraud through the investment adviser activities of BLMIS. The District Court Proceeding remains pending.

3

13. On December 12, 2008, The Honorable Louis L. Stanton of the District Court entered an order appointing Lee S. Richards as receiver for the assets of BLMIS.

14. On December 15, 2008, under § 78eee(a)(4)(A), the SEC consented to a combination of its own action with an application of the Securities Investor Protection Corporation ("SIPC"). Thereafter, under § 78eee(a)(4)(B) of SIPA, SIPC filed an application in the District Court alleging, *inter alia*, that BLMIS was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protections afforded by SIPA.

15. Also on December 15, 2008, Judge Stanton granted the SIPC application and entered an order under SIPA (known as the "Protective Decree"), which, in pertinent part:

   a. removed the receiver and appointed the Trustee for the liquidation of the business of BLMIS under SIPA § 78eee(b)(3);

   b. appointed Baker & Hostetler LLP as counsel to the Trustee under SIPA § 78eee(b)(3); and

   c. removed the case to the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") under § 78eee(b)(4) of SIPA.

16. By orders dated December 23, 2008, and February 4, 2009, respectively, the Bankruptcy Court approved the Trustee's bond and found the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of BLMIS.

17. At a plea hearing (the "Plea Hearing") on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213 (DC) (S.D.N.Y. March 12, 2009) (Docket No. 50), Madoff pled guilty to an eleven-count criminal information filed against him by the United States Attorney's Office for the Southern District of New York. At the Plea Hearing, Madoff

admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]." *Id.* at 23. Additionally, Madoff admitted "[a]s I engaged in my fraud, I knew what I was doing [was] wrong, indeed criminal." *Id.* On June 29, 2009, Madoff was sentenced to 150 years in prison.

18.     On August 11, 2009, a former BLMIS employee, Frank DiPascali, pled guilty to participating in and conspiring to perpetuate the Ponzi scheme. At a plea hearing on August 11, 2009, in the case entitled *United States v. DiPascali*, Case No. 09-CR-764 (RJS) (S.D.N.Y. Aug. 11, 2009), DiPascali pled guilty to a ten-count criminal information. Among other things, DiPascali admitted that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s. *Id.* at 46.

## IV.    TRUSTEE'S POWERS AND STANDING

19.     As Trustee appointed under SIPA, the Trustee is charged with recovering and paying out Customer Property to BLMIS customers, assessing claims, and liquidating any other assets of BLMIS for the benefit of the estate and its creditors. The Trustee is in the process of marshaling BLMIS's assets, and this liquidation is well underway. However, the estate's present assets will not be sufficient to reimburse BLMIS customers for the billions of dollars they invested with BLMIS over the years. Consequently, the Trustee must use his broad authority under SIPA and the Bankruptcy Code to pursue recoveries, including those from individuals and entities that received preferences and fraudulent transfers to the detriment of defrauded customers whose money was consumed by the Ponzi scheme. Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

20.     Under SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code, in addition to the powers granted by SIPA under

§ 78fff-1(b). Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this case to the extent consistent with SIPA.

21. Under SIPA §§ 78fff(b) and 78*lll*(7)(B), the Filing Date is deemed to be the date of the filing of the petition within the meaning of section 548 of the Bankruptcy Code and the date of commencement of the case within the meaning of section 544 of the Bankruptcy Code.

22. The Trustee has standing to bring these claims under § 78fff-1(a) of SIPA and the Bankruptcy Code, including sections 323(b), 544, and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers under §§ 544, 547, 548, 550(a), and 551 of the Bankruptcy Code and SIPA §§ 78fff-1(a) and 78fff-2(c)(3).

## V.    THE DEFENDANTS

23. Defendant Hapoalim B.M. is a private bank maintaining an address at 104 Hayarkon Street, Tel Aviv 63432, Israel. Defendant Hapoalim B.M. maintains a New York branch at 1177 Avenue of the Americas, New York, New York.

24. Defendant Hapoalim Switzerland is a Swiss private bank maintaining an address at Stockerstrasse 33, P.O. Box 1801, CH-8027 Zurich, Switzerland. Defendant Hapoalim Switzerland maintains branches in Geneva, Luxembourg, and Singapore.

## VI.   THE PONZI SCHEME

25. BLMIS was founded by Madoff in 1959 and, for most of its existence, operated from its principal place of business at 885 Third Avenue, New York, New York. Madoff, as founder, chairman, chief executive officer, and sole owner, operated BLMIS together with several of his friends and family members. BLMIS was registered with the SEC as a securities broker-dealer under Section 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(b). By virtue of that registration, BLMIS was a member of SIPC. BLMIS had three business units: market making, proprietary trading, and the IA Business.

6

26. Outwardly, Madoff ascribed the consistent success of the IA Business to the so-called split-strike conversion strategy ("SSC Strategy"). Under that strategy, Madoff purported to invest BLMIS customers' funds in a basket of common stocks within the Standard & Poor's 100 Index ("S&P 100")—a collection of the 100 largest publicly traded companies. Madoff claimed that his basket of stocks would mimic the movement of the S&P 100. He also asserted that he would carefully time purchases and sales to maximize value, and BLMIS customers' funds would, intermittently, be out of the equity markets.

27. The second part of the SSC Strategy was a hedge of Madoff's stock purchases with options contracts. Those option contracts acted as a "collar" to limit both the potential gains and losses on the basket of stocks. Madoff purported to use proceeds from the sale of S&P 100 call options to finance the cost of purchasing S&P 100 put options. Madoff told BLMIS customers that when he exited the market, he would close out all equity and option positions and invest all the resulting cash in United States Treasury bills or in mutual funds holding Treasury bills. Madoff also told customers that he would enter and exit the market between six and ten times each year.

28. BLMIS's IA Business customers received fabricated monthly or quarterly statements showing that securities were held in, or had been traded through, their accounts. The securities purchases and sales shown in the account statements never occurred, and the profits reported were entirely fictitious. At the Plea Hearing, Madoff admitted that he never made the investments he promised clients, who believed they were invested with him in the SSC Strategy. He further admitted that he never purchased any of the securities he claimed to have purchased for the IA Business's customer accounts. In fact, there is no record of BLMIS having cleared a single purchase or sale of securities in connection with the SSC Strategy on any trading platform

7

on which BLMIS reasonably could have traded securities. Instead, investors' funds were principally deposited into the BLMIS account at JPMorgan Chase & Co., Account #xxxxxxxxxxxx703.

29. Prior to his arrest, Madoff assured clients and regulators that he purchased and sold the put and call options on the over-the-counter ("OTC") market after hours, rather than through any listed exchange. Based on the Trustee's investigation to date, there is no evidence that the IA Business ever entered into any OTC options trades on behalf of IA Business account holders.

30. For all periods relevant hereto, the IA Business was operated as a Ponzi scheme. The money received from investors was not invested in stocks and options, but rather used to pay withdrawals and to make other avoidable transfers. Madoff also used his customers' investments to enrich himself, his associates, and his family.

31. The falsified monthly account statements reported that the accounts of the IA Business customers had made substantial gains, but in reality, due to the siphoning and diversion of new investments to fulfill payment requests or withdrawals from other BLMIS accountholders, BLMIS did not have the funds to pay investors for those new investments. BLMIS only survived as long as it did by using the stolen principal invested by customers to pay other customers.

32. It was essential for BLMIS to honor requests for payments in accordance with the falsely inflated account statements, because failure to do so promptly could have resulted in demand, investigation, the filing of a claim, and disclosure of the fraud.

33. Madoff's scheme continued until December 2008, when the requests for withdrawals overwhelmed the flow of new investments and caused the inevitable collapse of the Ponzi scheme.

34. Based upon the Trustee's ongoing investigation, it now appears there were more than 8,000 customer accounts at BLMIS over the life of the scheme. In early December 2008, BLMIS generated account statements for its approximately 4,900 open customer accounts. When added together, these statements purportedly showed that BLMIS customers had approximately $65 billion invested through BLMIS. In reality, BLMIS had assets on hand worth only a fraction of that amount. Customer accounts had not accrued any real profits because virtually no investments were ever made. By the time the Ponzi scheme came to light on December 11, 2008, with Madoff's arrest, investors had already lost approximately $20 billion in principal.

35. Thus, at all times relevant hereto, the liabilities of BLMIS were billions of dollars greater than its assets. BLMIS was insolvent in that: (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers, BLMIS was left with insufficient capital.

## VII. THE TRANSFERS

36. The Feeder Funds received initial transfers of BLMIS Customer Property. Some or all of those transfers were subsequently transferred directly or indirectly to the Hapoalim Defendants.

### A. KINGATE GLOBAL

#### 1. Initial Transfers From BLMIS To Kingate Global

37. The Trustee has filed an adversary proceeding against Kingate Global and other defendants in the Bankruptcy Court under the caption *Picard v. Kingate Global Fund, et al.,*

9

Adv. Pro. No. 09-01161 (BRL), in which, in part, the Trustee sought to avoid and recover initial transfers of Customer Property from BLMIS to Kingate Global in the amount of approximately $437,501,112 (the "Kingate Complaint"). The Trustee incorporates by reference the allegations contained in the Kingate Global Complaint as if fully set forth herein.

38. During the six years preceding the Filing Date, BLMIS made transfers to Kingate Global of approximately $398,704,065 (the "Kingate Global Six Year Initial Transfers"). The Kingate Global Six Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under sections 544, 550, and 551 of the Bankruptcy Code, §§ 273-279 of the NYDCL, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

39. The Kingate Global Six Year Initial Transfers include approximately $163,447,509 which BLMIS transferred to Kingate Global during the two years preceding the Filing Date (the "Kingate Global Two Year Initial Transfers"). The Kingate Global Two Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under sections 544, 548, 550, and 551 of the Bankruptcy Code, §§ 273-279 of the NYDCL, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

40. The Kingate Global Two Year Initial Transfers include approximately $101,753,145 which BLMIS transferred to Kingate Global during the 90 days preceding the Filing Date (the "Kingate Global Preference Period Initial Transfers"). The Kingate Global Preference Period Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under sections 547, 550, and 551 of the Bankruptcy Code, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

41. The Kingate Global Six Year Initial Transfers, the Kingate Global Two Year Initial Transfers, and the Kingate Global Preference Period Initial Transfers are collectively defined as the "Kingate Global Initial Transfers." Charts setting forth these transfers are attached as Exhibits A and B.

### 2. Subsequent Transfers From Kingate Global To Hapoalim Switzerland

42. A portion of the Kingate Global Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, Hapoalim Switzerland and is recoverable from Hapoalim Switzerland pursuant to section 550 of the Bankruptcy Code and § 278 of the NYDCL. Based on the Trustee's investigation to date, approximately $5,878,675 of the money transferred from BLMIS to Kingate Global was subsequently transferred by Kingate Global to Hapoalim Switzerland (the "Kingate Global Subsequent Transfers"). A chart setting forth the presently known Kingate Global Subsequent Transfers is attached as Exhibit C.

43. The Trustee's investigation is on-going, and the Trustee reserves the right to: (i) supplement the information on the Kingate Global Initial Transfers, the Kingate Global Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers.

### B.    FAIRFIELD SENTRY

### 1.    Initial Transfers From BLMIS To Fairfield Sentry

44. The Trustee has filed an adversary proceeding against Fairfield Sentry and other defendants in the Bankruptcy Court under the caption *Picard v. Fairfield Sentry Ltd., et al.,* Adv. Pro. No. 09-01239 (BRL), in which, in part, the Trustee sought to avoid and recover the initial transfers of Customer Property from BLMIS to Fairfield Sentry in the amount of approximately

11

$3 billion (the "Fairfield Amended Complaint"). The Trustee incorporates by reference the allegations contained in the Fairfield Amended Complaint as if fully set forth herein.

45. During the six years preceding the Filing Date, BLMIS made transfers to Fairfield Sentry of approximately $3 billion (the "Fairfield Sentry Six Year Initial Transfers"). The Fairfield Sentry Six Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under sections 544, 550, and 551 of the Bankruptcy Code, §§ 273-279 of the NYDCL, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

46. The Fairfield Sentry Six Year Initial Transfers include approximately $1.6 billion which BLMIS transferred to Fairfield Sentry during the two years preceding the Filing Date (the "Fairfield Sentry Two Year Initial Transfers"). The Fairfield Sentry Two Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under sections 544, 548, 550, and 551 of the Bankruptcy Code, §§ 273-279 of the NYDCL, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

47. The Fairfield Sentry Two Year Initial Transfers include approximately $1.1 billion which BLMIS transferred to Fairfield Sentry during the 90 days preceding the Filing Date (the "Fairfield Sentry Preference Period Initial Transfers"). The Fairfield Sentry Preference Period Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under sections 547, 550, and 551 of the Bankruptcy Code, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

48. The Fairfield Sentry Six Year Initial Transfers, the Fairfield Sentry Two Year Initial Transfers, and the Fairfield Sentry Preference Period Initial Transfers are collectively

12

defined as the "Fairfield Sentry Initial Transfers." Charts setting forth these transfers are attached as Exhibits D and E.

49. Pursuant to the Bankruptcy Court's June 7 and June 10, 2011 orders, the Bankruptcy Court approved a settlement among the Trustee, Fairfield Sentry, and others (the "Settlement Agreement"). As part of the Settlement Agreement, on July 13, 2011, the Bankruptcy Court entered a consent judgment granting the Trustee a judgment against Fairfield Sentry in the amount of $3,054,000,000. Fairfield Sentry is obliged to pay $70,000,000 to the Trustee under the terms of the Settlement Agreement.

### 2. Subsequent Transfers From Fairfield Sentry To Hapoalim Switzerland

50. A portion of the Fairfield Sentry Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, Hapoalim Switzerland and is recoverable from Hapoalim Switzerland pursuant to section 550 of the Bankruptcy Code and § 278 of the NYDCL. Based on the Trustee's investigation to date, approximately $20,047,109 of the money transferred from BLMIS to Fairfield Sentry was subsequently transferred by Fairfield Sentry to Hapoalim Switzerland (the "Fairfield Sentry-Switzerland Subsequent Transfers"). A chart setting forth the presently known Fairfield Sentry-Switzerland Subsequent Transfers is attached as Exhibit F.

51. The Trustee's investigation is ongoing, and the Trustee reserves the right to: (i) supplement the information on the Fairfield Sentry Initial Transfers, the Fairfield Sentry-Switzerland Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers.

### 3. Subsequent Transfers From Fairfield Sentry To Hapoalim B.M.

52. A portion of the Fairfield Sentry Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, Hapoalim B.M. and is recoverable from Hapoalim B.M. pursuant to section 550 of the Bankruptcy Code and § 278 of the NYDCL. Based on the Trustee's investigation to date, approximately $1,712,100 of the money transferred from BLMIS to Fairfield Sentry was subsequently transferred by Fairfield Sentry to Hapoalim B.M. (the "Fairfield Sentry-B.M. Subsequent Transfers"). A chart setting forth the presently known Fairfield Sentry-B.M. Subsequent Transfers is attached as Exhibit G.

53. The Trustee's investigation is ongoing, and the Trustee reserves the right to: (i) supplement the information on the Fairfield Sentry Initial Transfers, the Fairfield Sentry-B.M. Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers.

54. The Fairfield Sentry-Switzerland Subsequent Transfers and the Fairfield Sentry-BM Subsequent Transfers are collectively defined as the "Fairfield Subsequent Transfers."

### COUNT ONE
### RECOVERY OF KINGATE GLOBAL SUBSEQUENT TRANSFERS – 11 U.S.C. §§ 550 AND 551 AND NYDCL § 278

55. The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

56. Hapoalim Switzerland received the Kingate Global Subsequent Transfers, totaling approximately $5,878,675, which are recoverable pursuant to section 550(a) of the Bankruptcy Code and § 278 of the NYDCL.

57. Each of the Kingate Global Subsequent Transfers was made directly or indirectly to, or for the benefit of, Hapoalim Switzerland.

14

58. Hapoalim Switzerland is an immediate or mediate transferee of the Kingate Global Initial Transfers.

59. As a result of the foregoing, pursuant to sections 550(a) and 551 of the Bankruptcy Code, § 278 of the NYDCL, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Hapoalim Switzerland recovering the Kingate Global Subsequent Transfers, or the value thereof, for the benefit of the estate of BLMIS.

## COUNT TWO
## RECOVERY OF FAIRFIELD SENTRY SUBSEQUENT TRANSFERS –
## 11 U.S.C. §§ 550 AND 551 AND NYDCL § 278

60. The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

61. Hapoalim Switzerland received the Fairfield Sentry-Switzerland Subsequent Transfers, totaling approximately $20,047,109, and Hapoalim B.M. received the Fairfield Sentry-BM Subsequent Transfers, totaling approximately $1,712,100 (collectively, as defined above, the "Fairfield Subsequent Transfers"). The Fairfield Subsequent Transfers, totaling approximately $21,759,209, are recoverable pursuant to section 550(a) of the Bankruptcy Code and § 278 of the NYDCL.

62. Each of the Fairfield Sentry Subsequent Transfers was made directly or indirectly to, or for the benefit of, the Hapoalim Defendants.

63. The Hapoalim Defendants are immediate or mediate transferees of the Fairfield Sentry Initial Transfers.

64. As a result of the foregoing, pursuant to sections 550(a) and 551 of the Bankruptcy Code, § 278 of the NYDCL, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Hapoalim Defendants recovering the Fairfield Subsequent Transfers, or the value thereof, for the benefit of the estate of BLMIS.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against the Hapoalim Defendants as follows:

(a) On the First Claim for Relief pursuant to sections 550(a) and 551 of the Bankruptcy Code, § 278 of the NYDCL, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Hapoalim Switzerland recovering the Kingate Global Subsequent Transfers, or the value thereof, in an amount to be proven at trial, but no less than $5,878,675, for the benefit of the estate of BLMIS;

(b) On the Second Claim for Relief, pursuant to sections 550(a) and 551 of the Bankruptcy Code, § 278 of the NYDCL, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Hapoalim Defendants recovering the Fairfield Sentry Subsequent Transfers, or the value thereof, in an amount to be proven at trial, but no less than $21,759,209, for the benefit of the estate of BLMIS;

(c) Awarding the Trustee all applicable fees, interest, costs, and disbursements of this action; and

[*Remainder of Page Intentionally Left Blank*]

(d) Granting the Trustee such other, further, and different relief as the Court deems just, proper, and equitable.

Dated: March 29, 2012　　　　　　　　　　　/s/ David J. Sheehan
　　　　New York, New York　　　　　　　　**Baker & Hostetler LLP**
　　　　　　　　　　　　　　　　　　　　　45 Rockefeller Plaza
　　　　　　　　　　　　　　　　　　　　　New York, New York 10111
　　　　　　　　　　　　　　　　　　　　　Telephone: (212) 589-4200
　　　　　　　　　　　　　　　　　　　　　Facsimile: (212) 589-4201
　　　　　　　　　　　　　　　　　　　　　David J. Sheehan
　　　　　　　　　　　　　　　　　　　　　Mark A. Kornfeld
　　　　　　　　　　　　　　　　　　　　　Michelle R. Kaplan
　　　　　　　　　　　　　　　　　　　　　Torello H. Calvani

　　　　　　　　　　　　　　　　　　　　　**Baker & Hostetler LLP**
　　　　　　　　　　　　　　　　　　　　　65 East State Street, Suite 2100
　　　　　　　　　　　　　　　　　　　　　Columbus, Ohio 43215
　　　　　　　　　　　　　　　　　　　　　Telephone: (614) 228-1541
　　　　　　　　　　　　　　　　　　　　　Facsimile: (614) 462-2616
　　　　　　　　　　　　　　　　　　　　　Thomas L. Long

　　　　　　　　　　　　　　　　　　　　　*Attorneys for Irving H. Picard, Trustee*
　　　　　　　　　　　　　　　　　　　　　*for the Substantively Consolidated SIPA*
　　　　　　　　　　　　　　　　　　　　　*Liquidation of Bernard L. Madoff Investment*
　　　　　　　　　　　　　　　　　　　　　*Securities LLC and Bernard L. Madoff*